IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL K. MILLER, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 2:15-cv-662 |
| | ) |
| v. | ) |
| | ) Magistrate Judge Lisa Pupo Lenihan |
| DEPUTY WARDEN CAROL STEELE-SMITH; SOUTHERN HEALTH PARTNERS; BETH HARRIS, MSM; BETTY WEGNER, RN; AND BEAVER COUNTY, | ) |
| | ) ECF Nos. 50, 53 |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

This is a civil rights action under 42 U.S.C. § 1983 filed by Plaintiff, Michael K. Miller, regarding medical treatment he received while he was a pretrial detainee at the Beaver County Jail. Southern Health Partners is a private corporation that provides medical services to inmates at the jail. Beth Harris is the jail's medical services manager, Betty Wegner is a nurse at the jail, and Carol Steele-Smith is the jail's deputy warden ("Individual Defendants"). Pending before the Court are the motions for summary judgment filed by Defendants. (ECF Nos. 50, 53). For the following reasons, the motions will be granted.

### I. BACKGROUND

On May 23, 2013, Plaintiff was in a car accident while driving under the influence of alcohol and drugs. Med. Defs.' Concise Statement of Material Facts ("CSMF") ¶ 3. At the time, he was on parole for a prior DUI conviction. Pl.'s Dep. at 33:4-6. Following the accident,

1

Plaintiff was arrested and taken to Heritage Valley Hospital with complaints of lower back pain.[1] Med. Des.' CSMF ¶¶ 4, 5. Upon examination, Plaintiff exhibited some tenderness in his lower lumbar region and a "mild amount of abrasion over the knuckles" of his left hand, but "[n]o crepitation or deformity." Med. Defs.' Ex. B, ECF No. 51-1 at 14. Plaintiff also had normal strength in his upper extremities. Id. According to Plaintiff, he was blacked out during this evaluation, and he has no specific recollection of what happened at the hospital. Pl.'s Dep. at 36:12-14.

Following his discharge around midnight on May 23, Plaintiff was taken to the Beaver County Jail, where, early the next morning, he underwent an initial medical screening with Angela Pugh, LPN. Med. Defs.' CSMF ¶ 10. Upon examination, Pugh noted that Plaintiff had cuts on his left hand and appeared to still be under the influence of alcohol. Med. Defs.' Ex. D., ECF No. 51-1 at 20. Plaintiff testified, however, that by the time he met with Pugh, he "had already discovered that [he] had pain to [his] wrist" and that his wrist was moving abnormally. Pl.'s Dep. at 44:20-21. He alleges that he told the nurse that his wrist was broken and held it up to show her. Id. at 45:1-7. Pugh allegedly responded, "'I don't see anything wrong with it[,]'" and gave him a Tylenol. Id. at 45:22-23.

During the intake screening, Pugh had Plaintiff execute an authorization for Heritage Valley to release his medical records, including "any/all x-ray/lab results including any follow up care." Med. Defs.' Ex. E, ECF No. 51-1 at 22. Lab results and two discharge summary forms were faxed to the jail later that day. Pl.'s Ex. C, ECF No. 60-3. According to a "Physician's Order" form, Dr. Earnest Bonitatibus prescribed Motrin and Flexeril on May 24, which

---

[1] Plaintiff had gone to Heritage Valley the day before the accident complaining of back pain. Cnty. Defs.' Ex. F, ECF No. 51-1 at 2. At that time, he was prescribed Flexeril, Vicodin, and Naprosyn. Id. at 3. He was apparently mixing Vicodin with vodka when the accident occurred.

medication administration records indicate he received as directed.[2] Med. Defs.' CSMF ¶ 15. Two days later, Dr. Bonitatibus issued an order by phone for Plaintiff to receive an extra blanket to elevate his left arm. Id. ¶ 16.

Plaintiff was examined by Dr. Bonitatibus on May 28, 2013. Id. ¶ 19. Dr. Bonitatibus prescribed Plaintiff Naprosyn in place of Motrin, along with Tylenol as needed. He also ordered the nursing staff to obtain the records from Plaintiff's emergency room visit to determine whether his left wrist had been x-rayed.[3] Id. If not, Dr. Bonitatibus ordered an x-ray be scheduled. Id. Per Dr. Bonitatibus's order, Harris made a second record request from Heritage Valley. The records were received via fax later that day. Pl.'s Ex. E, ECF No. 59-5 (handwritten notation indicating "[r]ecords rec'd 5/28/2013"). For unspecified reasons, Harris did not contact Dr. Bonitatibus until May 31 to advise him that an x-ray had not been completed. Upon learning that, Dr. Bonitatibus ordered Harris to schedule an x-ray with Mobile X. Med. Defs.' Ex. H, ECF No. 51-1 at 31. The x-ray was scheduled for June 3. Harris could not recall why the x-ray was not scheduled until then. Harris Dep. at 105:7.

---

[2] Plaintiff disputes that he received his medications as directed, though his testimony is far from clear on this point. See, e.g., Pl.'s Dep. at 53-55, 122. He initially testified that he was given a single Tylenol during his intake screening and then started to receive Naprosyn following his x-ray on June 3. Id. at 55:25-56:3. He said he was not sure whether he ever received Flexeril. Id. Later in his deposition, he testified that he could "not recall" receiving anything other than the Tylenol he got from Pugh on May 24 between his arrival and June 3, when he went for the x-ray. Id. at 124:8-9. Then, when pressed, he stated affirmatively that he "did not receive medication" during that time period. Id. at 124:13-14. At any rate, even if Plaintiff was not given his prescribed medications during that time period, there is no basis to impose liability on Defendants Harris or Wegner for this because there is no evidence that either of these Defendants were responsible for administering Plaintiff's prescribed medications and deliberately withheld it from him. Indeed, Harris could not administer Plaintiff's medications because she was not a nurse.

[3] The ER records were not included in the first batch of records obtained from Heritage Valley. Compare Pl.'s Ex. C, ECF No. 59-3 (records received on May 24) with Pl.'s Ex. E, ECF No. 59-5 (records received on May 28).

Plaintiff underwent the x-ray as scheduled, which revealed an acute fracture of the distal radius. Med. Defs.' Ex. H, ECF No. 51-1. On June 4, 2013, Wegner examined Plaintiff and noted, among other things, that his left wrist was swollen and that there was a fracture. Med. Defs.' Ex. K, ECF No. 51-1 at 37.

Although the x-ray took place on June 3,[4] for reasons she could not recall, Harris did not report the results to Dr. Bonitatibus until June 6, at which point Dr. Bonitatibus directed Harris to refer Plaintiff to an orthopedic specialist, Dr. Bernard Hirsch. Med. Defs.' Ex. F, ECF No. 51-1 at 24; Med Defs.' Ex. H, ECF No. 51-1 at 31. Harris scheduled an appointment for June 10. Id. That same day, Plaintiff was also placed on bottom bunk status. Med. Defs.' Ex. F, 51-1 at 24.

At the June 10 appointment, Dr. Hirsch diagnosed Plaintiff with a displaced left distal radius fracture and recommended that he be referred to a hand surgeon for a consultation. Med. Defs.' CSMF ¶ 33. Dr. Hirsch noted that Plaintiff "may remove splint for hygiene only."[5] Med. Defs.' Ex. L, ECF No. 51-1 at 40.

That same day, the Court of Common Pleas of Beaver County issued an order releasing Plaintiff on a $1.00 bond. Med. Defs. Ex. M, ECF No. 51-1 at 42. The order further noted that the Pennsylvania Board of Probation and Parole was set to detain Plaintiff upon his release on bond and transfer him to a state facility. Id. The medical staff was thereafter informed that Plaintiff was set to be transferred. On June 13, 2013, Harris completed an inmate transfer form,

---

[4] The radiology report is dated June 3, but there is no evidence when it was received by Harris.

[5] Despite the references to a splint in the record, Plaintiff testified that he "never had a splint." Pl.'s Dep. at 132:16; id. at 76:21. However, he did testify that he was "given a sling," id. at 76:23, and he was "not certain" whether he was given an ACE bandage, id. at 77:6. For her part, Harris testified that she could not recall whether Plaintiff was given a splint. Harris Dep. at 76:22. Dr. Bonatatibus testified that he believes Plaintiff had been given a soft splint or an elastic bandage, though he could not "remember specifically" and admitted that there was nothing in Plaintiff's medical records indicating that any type of immobilizing device was ever ordered. Bonatatibus Dep. at 59:6-15.

4

in which she indicated that Plaintiff had a "splint on [his] left hand/wrist" and was taking Naproxen and Tylenol. Med. Defs.' Ex N, ECF No. 51-1 at 44. Harris further noted that Plaintiff needed a have a consultation scheduled with a hand surgeon. Id. Plaintiff was released from the jail later that day and transferred to SCI-Pittsburgh.

According to Plaintiff, at some point prior to his transfer, he had one encounter with Steele-Smith regarding his wrist injury. Cnty. Defs.' CSM ¶ 63. Plaintiff testified that his mother called the jail, and he was brought to an "administration room" to speak to her. Id. ¶ 64-65. After speaking with his mother, Plaintiff raised his left arm so that Steele-Smith could see it and "said, 'Listen, I need treatment. I am not getting treated in medical.'" Pl.'s Dep. at 136:25 – 137:1-3. Plaintiff claims that his wrist was "[d]isfigured" at the time. Pl.'s Dep. at 137:14. After Plaintiff broached the subject, Steele-Smith allegedly "turned her back on [him] before she even answered" and "over her shoulder" said, "'I'm sure they are treating you.'" Id. at 76:3-8.

On August July 3, 2013, Plaintiff was seen by an orthopedic surgeon, Edward L. Birdsong, M.D., for a consultation. Cnty. Defs.' Ex. N, ECF No. 55-14 at 2. Plaintiff "complain[ed] of swelling, pain and deformity of the wrist[,]" which was exacerbated by "[a]ny kind of activity." Id. However, "[a]t complete rest with the splint in place, he [was] relatively pain free." Id. Upon examination, Dr. Birdsong diagnosed Plaintiff with a malunion of the left distal radius. Id. After Dr. Birdsong explained that the bone would never return to normal alignment if left untreated, Plaintiff elected to have corrective surgery. Id. at 3. Plaintiff underwent the surgery on August 1, 2013, after which he was placed in a short arm cast. Id. at 4-6. The cast was removed on September 13, 2013, at which point Dr. Birdsong noted that Plaintiff was doing "quite well" and displayed a good range of motion. Id. at 7. X-rays showed that the bone was in "excellent alignment[.]" Id. However, Plaintiff continues to experience "a dull ache"

5

in his wrist. Pl.'s Dep. at 100:3. He also testified that he feels a "slight weakness" in some of his fingers.[6] Id.

Plaintiff initiated this action by filing a complaint against Steele-Smith, Southern Health Partners, Beaver County, and various "Doe" Defendants on May 20, 2015. (ECF No. 1). Beaver County and Steele-Smith responded by filing a partial motion to dismiss. (ECF No. 12). On August 28, 2015, Plaintiff filed an amended complaint, in which Steele-Smith, Beaver County, Southern Health Partners, Harris, and Pugh were named as Defendants. (ECF No. 26). On August 31, 2016, Plaintiff filed a stipulation of dismissal as to Pugh. (ECF Nos. 48). Following the close of discovery, Defendants filed the pending motions, which have been fully briefed and are ripe for disposition. (ECF Nos. 51, 52, 54-63).

## II. **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(c)(2) provides that summary judgment shall be granted if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(e)(2) further provides that when a motion for summary judgment is made and supported, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must-by affidavits or as otherwise provided in this rule-set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."

---

[6] Plaintiff makes various references to "compartment syndrome" in his filings, which he claims was caused by the alleged delay in treatment. However, he has not cited any evidence indicating that he was ever actually diagnosed with compartment syndrome. In fact, when asked in his deposition whether any medical professional ever diagnosed him with this condition, he testified no. Pl.'s Dep. at 102:18. To be sure, Plaintiff's purported expert, Michelle DePree, LPN, references compartment syndrome in her affidavit, but she does she identify which of the records she reviewed contains this diagnosis. Thus, the Court concludes that Plaintiff has not created a genuine issue of fact as to whether he suffered from compartment syndrome.

6

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact. Fed. R. Civ. P. 56(C). The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007); UPMC Health Sys. v. Met. Life Ins. Co., 391 F.3d 497, 502 (3d Cir. 2004).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322. See also Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." Garcia v. Kimmell, 2010 WL 2089639, at * 1 (3d Cir. 2010) (quoting Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005)).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

A fact is material if its resolution will affect the outcome of the case under applicable law. Anderson, 477 U.S. at 248. Summary judgment is only precluded if the dispute about a

material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 247–249.

## III. DISCUSSION

### A. Claims against the Individual Defendants

Plaintiff alleges that the Individual Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth, Fifth, and Fourteenth Amendments.[7] To establish a claim for deliberate indifference under the Eighth Amendment, a plaintiff must satisfy the two-part test drawn from Estelle v. Gamble, 429 U.S. 97, 104 (1976) (citing Gregg v. Georgia, 428 U.S. 153, 173 (1976)). "First, plaintiff must make an 'objective' showing that the deprivation was 'sufficiently serious,' or that the result of defendant's denial was sufficiently serious. Additionally, the plaintiff must make a 'subjective' showing that defendant acted with 'a sufficiently culpable state of mind'" – i.e., "deliberate indifference" Montgomery v. Pinchak, 294 F.3d 492, 499 (3d Cir. 2002) (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).

A medical need is "serious" if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Atkinson v. Taylor, 316 F.3d 257, 272–73 (3d Cir. 2003). "The seriousness of an inmate's medical need may also be determined by reference to the effect of denying the particular treatment." Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d

---

[7] Since Plaintiff was a pretrial detainee, his claim must be premised on the Fourteenth Amendment because "his Eighth Amendment protection from cruel and unusual punishment [had] not yet attached." Vargo ex rel. Vargo v. Plum Borough, 376 F. App'x 212, 215 (3d Cir. 2010) (citing Colburn v. Upper Darby Twp., 838 F.2d 663, 668 (3d Cir. 1988)). Nevertheless, the Supreme Court has instructed that "the Fourteenth Amendment affords pretrial detainees protections 'at least as great as the Eighth Amendment protections available to a convicted prisoner[.]'" Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 581 (3d Cir.2003) (quoting City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983)). Thus, his claim will be evaluated under the familiar Eighth Amendment standard. King v. Cnty. of Gloucester, 302 F. App'x 92, 97 (3d Cir. 2008).

8

326, 347 (3d Cir. 1987) (citations omitted). "In addition, where denial or delay causes an inmate to suffer a lifelong handicap or permanent loss, the medical need is considered serious." Id.

To demonstrate "deliberate indifference," the plaintiff "must make a subjective showing that defendant acted with a sufficiently culpable state of mind." Pinchak, 294 F.3d at 499. The level of culpability required lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." Thomas v. Dragovich, 142 F. App'x 33, 36 (3d Cir. 2005) (citing Farmer v. Brennan, 511 U.S. 825, 835 (1994)). A prison official must "know of an excessive risk to an inmate's health or safety and affirmatively disregard it." Innis v. Wilson, 334 F. App'x 454, 456 (3d Cir. 2009) (citing Farmer, 511 U.S. at 835-38). The Third Circuit Court of Appeals has "found 'deliberate indifference' in a variety of circumstances, including where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999) (citations omitted). Conversely, "[m]ere medical malpractice cannot give rise to a violation of the Eighth Amendment." White v. Napoleon, 897 F.2d 103, 108 (3d Cir. 1990). As our Court of Appeals long ago explained, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." United States ex rel. Walker v. Fayette Cnty., 599 F.2d 573, 575 n.2 (3d Cir. 1979).

Defendants do not contest that Plaintiff's broken wrist amounted to a serious medical need. Instead, they argue that Plaintiff has failed to adduce any evidence of deliberate indifference. The Court will address the evidence against each Defendant in turn.

### 1. Harris

With regard to Harris, Plaintiff is essentially claiming that she waited too long to schedule an x-ray after she was ordered to do so by Dr. Bonatatibus and then, after receiving the diagnostic report from Mobile X, waited too long to notify Dr. Bonatatibus of the results. He also appears to claim that Harris should have scheduled his appointment with the orthopedic specialist for an earlier date and that she should have scheduled him an appointment with a hand surgeon as soon as he returned from his appointment with Dr. Hirsch. See Pl.'s Br. at 7-8. None of these claims have merit.

First, the alleged delay in scheduling an x-ray does not amount to deliberate indifference See Cobbs v. Caputo, 578 F. App'x 84, 85 (3d Cir. 2014) (explaining that a "delay in x-raying . . . does not" constitute deliberate indifference). That is true even if Harris should have known as early as May 24 (when the first hospital records were received) that an x-ray had not been taken while Plaintiff was in the emergency room. For whatever reason, on May 28, Dr. Bonitatibus ordered Harris to obtain the medical records from Plaintiff's emergency room visit, which were not among the first records faxed to the jail. Harris cannot be deemed deliberately indifferent because she carried out this directive. At most, she was negligent. See id. (quoting Estelle, 429 U.S. at 107).

Likewise, the three-day delay in reporting the results of the x-ray is insufficiently serious to run afoul of the Eighth Amendment. See, e.g., Patterson v. Westchester Cnty., No. 13 CIV. 0194 PAC AJP, 2014 WL 1407709, at *7 (S.D.N.Y. Apr. 11, 2014) (noting that "the several-day delay in . . . reporting the results of an x-ray that revealed torn ankle ligaments does not constitute a sufficiently serious treatment delay"). The alleged delay in scheduling an appointment with the orthopedic specialist, Dr. Hirsch, does not rise to that level, either. Harris

10

apparently got the order to refer Plaintiff to a specialist on June 6, and she scheduled him an appointment for June 10 – just four days later. There is no evidence that Harris could have scheduled the appointment sooner; perhaps Dr. Hirsch simply had no other availability. See Wood v. Prison Health Servs., Inc., No. CIV. A. 05-00578-CG-, 2008 WL 205314, at *10 (S.D. Ala. Jan. 22, 2008) ("Delays in scheduling free world specialist appointments may occur as a result of a number of reasons, particularly in the prison system where numerous factors must be considered and coordinated, as well as accommodating the usually busy schedule of the free world doctors."). Nor is there any evidence that Harris was subjectively aware that four-day wait could lead to substantial harm and nonetheless intentionally waited to schedule the appointment. See Thomas v. Carter, 593 F. App'x 338, 344 (5th Cir. 2014) ("While the intentional failure to schedule an appointment with a medical specialist may amount to deliberate indifference when it causes substantial harm, the negligent failure to schedule an appointment does not."). Finally, to the extent Plaintiff is claiming that Harris should have scheduled him for an appointment with an orthopedic surgeon when he returned from his appointment with Dr. Hirsch, this claim would fail because, as Harris testified, she did not have the authority to refer an inmate to an outside specialist on her own. See Williams v. Guzman, 346 F. App'x 102, 106 (7th Cir. 2009) (finding "no evidence that nurses acted with any culpable state of mind" by not referring the inmate to a specialist because "nothing the record suggests that they had authority to refer inmates to outside specialists"). Because Plaintiff has failed to create a genuine issue of material fact as to an essential element of his claim against Harris, summary judgment will be entered in Harris's favor.[8]

---

[8] Plaintiff insinuates throughout his filings that Harris, who is a not a nurse, engaged in the unauthorized practice of nursing in violation of Pennsylvania law because she carried out Dr. Bonatatibus's orders to schedule an x-ray and refer Plaintiff to an orthopedic specialist. See, e.g.,

11

### 2. Wegner

Plaintiff alleges that "Wegner totally denied [him] treatment[,]" and points to three specific instances when that allegedly took place. Pl.'s Br. at 18. He first contends that Wegner "should have proceeded right away with an x-ray instead of needlessly seeking [Heritage Valley] records a second time, and then utterly failing to carry out the May 28th Order for an x-ray after immediately reconfirming on May 28th that no x-ray occurred at [Heritage Valley]." Id. Second, he contends that he was never "provided with a splint or sling" to immobilize his wrist. Id. And third, he claims that Wegner "exhibited horrible indifference" during the June 4 physical examination she conducted. Id. at 19.

As to the first contention regarding the delay in scheduling an x-ray, this claim fails for the same reasons set forth *supra* with respect to the claim against Harris. See Cobbs, 578 F. App'x at 85. Plaintiff fares no better with his second contention. Contrary to what he now claims in his brief, he testified at his deposition that he *was* "given a sling," and he could not say with certainty that he was not given an ACE bandage. See Pl.'s Dep. at 76:23, 77:6. This is consistent with the Dr. Bonatatibus's testimony that Plaintiff's wrist would have been immobilized with

---

Pl.'s Resp. to Defs.' CSMF at 4. This argument is baseless. It is true that it is unlawful to practice nursing in Pennsylvania without a license. See 63 P.S. § 664(4). The "'practice of practical nursing' means the performance of selected nursing acts in the care of the ill, injured or infirm under the direction of a licensed professional nurse, a licensed physician or a licensed dentist[.]" Id. § 652(1). This law notwithstanding, Pennsylvania allows a person without a nursing license to engage in "[a]uxiliary services . . . necessary for the support of nursing service, including those duties which involve minor and very basic nursing services for patients, performed in health care facilities or elsewhere under the direction of licensed physicians or as delegated by licensed registered nurses and performed under the direction of professional nurses or licensed practical nurses." Id. § 653(10). Scheduling an x-ray and an appointment with a specialist would seem to fall squarely within this exception. While Plaintiff relies on 49 Pa. Code § 21.145(b)(2)(i) to suggest otherwise, the Court does not find that section relevant. It says nothing about whether a person in Harris's position could carry out a physician's order for an x-ray. Rather, it only pertains to carrying out orders for medication and therapeutic treatment, neither of which Harris did.

either a soft splint or an elastic bandage and the references to a splint elsewhere in the medical records. In view of that, while it may be unclear what type of immobilizing device Plaintiff was provided, the undisputed evidence, including his own testimony, establishes that his arm was immobilized in some manner. That he may not have received the precise type of immobilizing device that he wanted does not establish an Eighth Amendment violation. Mackey v. Bureau of Prisons, No. CIV. 4:CV-05-2607, 2006 WL 224015, at *2 (M.D. Pa. Jan. 30, 2006) (stating that a "mere difference of opinion between the inmate and the prison's medical staff regarding the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment").

Finally, there is no evidence of deliberate indifference by Wegner at the June 4 physical evaluation. Plaintiff claims that Wegner should have notified Dr. Bonatatibus of the results of the x-ray, which took place the day before, but there is no evidence that Wegner knew or could have known of the results when she examined Plaintiff on June 4. Plaintiff also claims that she could have offered Plaintiff a sling or splint during this exam, but, as Plaintiff himself admitted, he had actually been given a sling. See Pl.'s Dep. at 76:23. There is, thus, absolutely no basis to impose liability on Wegner under the Fourteenth Amendment. On this sparse record, no reasonable jury could conclude that she was negligent, let alone deliberately indifferent. Therefore, her motion for summary judgment will be granted.

### 3. Steele-Smith

In general, non-physician prison officials cannot "be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993). This rule is not absolute, though. If the prison official has "reason to believe (or actual

13

knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner," the official may be held liable. Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004).

Here, Plaintiff was under the care of the medical staff during the duration of his incarceration at the jail. Even if Plaintiff did complain to Steele-Smith about his wrist, as he claims, that would not be enough to establish deliberate indifference on Steele-Smith's part. Steele-Smith had no expertise by which to question the medical determination of the medical staff, which had examined Plaintiff, reviewed his medical records, ordered and reviewed the x-ray of his wrist, and referred him to an orthopedic specialist for a consultation. Since the only allegation regarding Steele-Smith is that she failed to intervene in the medical care that the record establishes was already being provided to Plaintiff by medical professionals, she is entitled to summary judgment.

### B. Claims against Southern Health Partners and Beaver County

Plaintiff also seeks to impose Monell liability on Southern Health Partners and Beaver County. However, because the Individual Defendants are entitled to summary judgment regarding the alleged delay in providing Plaintiff treatment for his fractured wrist, there is no basis to impose liability on either Southern Health Partners or Beaver County. See Los Angeles v. Heller, 475 U.S. 796, 799 (1986). Thus, summary judgment will be granted in their favor.

### IV. **CONCLUSION**

For the foregoing reasons, Defendants' motions for summary judgment (ECF Nos. 50, 53) will be granted. A separate Order will issue.

Dated: December 27, 2016

Lisa Pupo Lenihan
United States Magistrate Judge

14